UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| CAJUN KLEEN PRODUCTS, LLC | CIVIL ACTION NO. 3:16-CV-00062 |
| VERSUS | JUDGE JAMES |
| PAUL RIDER, PROFESSIONAL CAR PRODUCTS, LLC, AND RODNEY POTTS, JR. | MAGISTRATE JUDGE HAYES |

## **COMPLAINT**

NOW INTO COURT, comes plaintiff Cajun Kleen Products, LLC, a Louisiana limited liability company, which respectfully avers as follows:

### **JURISDICTION AND VENUE**

1.

This action arises under 15 USC § 1125, as well as under Louisiana state law.

2.

This Court has jurisdiction under 28 USC § 1331 and § 1367 and 15 USC § 1116(a).

3.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

### **PARTIES**

4.

Defendant Paul Rider is a major resident of Ouachita Parish, Louisiana.

5.

Defendant Professional Car Products, LLC is a Louisiana limited liability company which has its principal place of business in Jackson Parish, Louisiana.  Its registered agent

for service of process is defendant Rodney Potts, Jr.

6.

Defendant Rodney Potts, Jr. is a major resident of Jackson Parish, Louisiana.

**FACTS**

7.

Cajun Kleen is a primarily a manufacturing business.  Among other things, Cajun Kleen manufactures and sells cleaning products and industrial detergents.  Cajun Kleen's bell cow product is a cleaning solution named "Cajun Brown."  Cajun Kleen makes several other products, but another of its products at issue in this action is named "Cajun Blue."

8.

Cajun Brown is a detergent, make from a secret formula, that is most commonly used to clean trucks, heavy equipment, and oilfield equipment.  It is a highly effective and sought after product.  Due to the fact that Cajun Brown's ingredients and formula are a closely guarded trade secret, there is no product on the market that is the equivalent to Cajun Brown.

9.

Cajun Blue is a degreaser, which is sometimes marketed as Bi-UBlue.  Like Cajun Brown, it is a highly effective and sought after product.  Also like Cajun Brown, the ingredients and formula for Cajun Blue are secret and a closely guarded trade secret of Cajun Kleen.

10.

The formulas used to manufacture Cajun Brown and Cajun Blue are closely guarded trade secrets.  Cajun Brown and Cajun Blue were invented by Don Rider, the father of

defendant Paul Rider. To Cajun Kleen's knowledge, only four people know the formulas for Cajun Brown and Cajun Blue: Don Rider, Paul Rider, David Rider (another son of Don Rider), and Wess McCurdy (one of the members of Cajun Kleen).

11.

Prior to February of 2012, Cajun Brown and Cajun Blue were manufactured and sold by Anchor Chemical, Inc., a company owned by Don Rider.  On February 16, 2012, Cajun Kleen purchased the assets of Anchor Chemical, including the formulas for and the right to manufacture Cajun Brown and Cajun Blue, as well as all other secret recipes of Anchor Chemical.  The formulas for Cajun Brown and Cajun Blue (as well as the other formulas) were so well guarded by Anchor Chemical that it refused to disclose the formulas to Cajun Kleen until after the purchase price was paid by Cajun Kleen.

12.

At the time of the sale, both Anchor Chemical and Cajun Kleen recognized that the primary asset of the sale was the secret formulas that were being sold.  Accordingly, the parties agreed that "All products manufactured or produced, recipes, and secrets shall be transferred to the buyer and shall be kept completely confidential by the sellers, and family members known to have knowledge of product makeup or recipe.  Seller shall transfer originals of all recipes for producing Cajun Brown, Cajun Blue, AC1, Anchor Trailbrite, Cajun Red and many unnamed recipes used to manufacture company products."

13.

Prior to the February 2012 sale, Paul Rider was employed by Anchor Chemical. Following the sale, Cajun Kleen hired Paul Rider.  Paul Rider worked for Cajun Kleen, primarily as a salesman, from February of 2012 until August of 2015.

14.

In September of 2015, for reasons unclear to Cajun Kleen, Paul Rider became disenchanted with Cajun Kleen and walked off the job. Paul Rider never formally tendered his resignation; he packed his belongings on a Friday afternoon and never returned. The next day, Wess McCurdy texted Paul Rider and attempted to engage him and possibly get him to return to work. Paul Rider never responded to McCurdy's texts.

15.

In January of 2016, Cajun Kleen became aware that Paul Rider had become associated with defendant Professional Car Products, Inc. ("PCP") and it's principal, defendant Rodney Potts, Jr. Shortly thereafter, Cajun Kleen learned that Rider, PCP, and Potts had begun manufacturing and selling products called "Geaux Brown" and "Geaux Blue."

16.

Cajun Kleen also learned in January of 2016 that Paul Rider was soliciting its customers, in an attempt to sell Geaux Brown and Geaux Blue. According to several of Cajun Kleen's customers, Paul Rider was telling Cajun Kleen's customers that Geaux Brown "is Cajun Brown" and that his "dad invented the formula" (or words to that effect). He has also told customers that Geaux Brown "isn't *like* Cajun Brown, it *is* Cajun Brown" (or words to that effect). Furthermore, he has told them that "it's the same product, just a different name" (or words that effect). Paul Rider and PCP are selling Geaux Brown and Geaux Blue to Cajun Kleen's customers for significantly less than Cajun Brown and Cajun Blue could be purchased from Cajun Kleen.

17.

Defendants have sold, and offered to sell, Geaux Brown and Geaux Blue to many of Cajun Kleen's customers, as well as to retailers, making Geaux Brown and Geaux Blue available to the general public.

18.

Since the purchase of Anchor Chemical in February of 2012, Cajun Kleen has expended significant money, time, and hard work to market Cajun Brown and Cajun Blue. Cajun Kleen has increased the sales of Cajun Brown by approximately 700% since it was purchased from Anchor Chemical.

19.

The use of the terms "Geaux Brown" and "Geaux Blue" by defendants constitutes dilution by blurring and/or dilution by tarnishing of a famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

20.

The name "Geaux Brown" is extraordinarily similar to the name "Cajun Brown," and the name "Geaux Blue" is extraordinarily similar to the name "Cajun Blue."  The word "geaux," which is the "Cajun" spelling of the word "go," is considered to be a "Cajun" word. The word "geaux" is inextricably linked with the word "Cajun."  Thus, the term "Geaux Brown" is virtually identical to the term "Cajun Brown," and the term "Geaux Blue" is virtually identical to the term "Cajun Blue."

21.

By using the terms "Geaux Brown" and "Geaux Blue" for their products, defendants have used terms in commerce that are likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of defendant's products with the products of Cajun Kleen, Cajun Brown and Cajun Blue.

22.

Cajun Kleen's marks of "Cajun Brown" and "Cajun Blue" are widely recognized by the general consuming public of the United States as a designation of source of the goods of Cajun Kleen.

23.

The degree of similarity between the marks "Cajun Brown" and "Geaux Brown" and between the marks "Cajun Blue" and "Geaux Blue" is great.  The terms are virtually identical.

24.

The marks "Cajun Brown" and "Cajun Blue" have both inherent and acquired distinctiveness, as (1) Cajun Kleen's principal place of business is in Louisiana, (2) Cajun Kleen has expended great resources and effort to associate the marks with its distinctive, one-of-a-kind products made from a secret formula, and (3) customers throughout the United States have come to associate the marks with Cajun Kleen's products.

25.

Cajun Kleen is engaged in substantially exclusive use of the marks "Cajun Brown" and "Cajun Blue."

26.

Within the industries which use commercial cleaners and solvents, the marks "Cajun Brown" and "Cajun Blue" are well known and easily recognizable as the one-of-a-kind products of Cajun Kleen.

27.

There can be no doubt that defendants, through their use of the terms "Geaux Brown" and "Geaux Blue" intended to create an association with the marks "Cajun Brown" and "Cajun Blue." As is discussed below, Geaux Brown *is the same product* as Cajun Brown, with a name that is virtually indistinguishable and Geaux Blue *is the same product* as Cajun Blue, with a name that is virtually indistinguishable. As just one example of this confusion created by defendants, see the receipts attached as Exhibit A from Northeast Truck and Trailer Parts, wherein, following the purchases of Geaux Brown and Geaux Blue for use in this lawsuit, the seller's invoices indicated that it had sold Cajun Brown and Cajun Blue.

28.

The marks "Cajun Brown" and "Cajun Blue" have been in existence for seven years. They have been marketed by Cajun Kleen, through the use of the internet Cajun Kleen's sales force, and Cajun Kleen's distributors located throughout the United States since Cajun Kleen purchased them from Anchor Chemical in February of 2012.

29.

Cajun Kleen has 61 dealers, located in nine states (Louisiana, Texas, Arkansas, Mississippi, Alabama, Florida, Pennsylvania, Missouri, and Wisconsin). In addition, over the past two years, Cajun Kleen has sold Cajun Brown in 16 states (Louisiana, Texas,

Arkansas, Mississippi, Alabama, Florida, Pennsylvania, Missouri, Wisconsin, South Dakota, New York, California, Arizona, Indiana, Oregon, and Colorado).

30.

The marks "Cajun Brown" and "Cajun Blue" are well known throughout the car wash, trucking, heavy equipment, and oil field industries. Cajun Brown and Cajun Blue are generally known to be exceptional products that are used primarily for the cleaning of heavy equipment and semi trucks.

31.

The marks "Cajun Brown" and "Cajun Blue" have not been registered under the Act of March 3, 1881 or the Act of February 20, 1905, or on the principal register.

32.

In addition to dilution by blurring, defendants have misappropriated Cajun Kleen's trade secret – the secret formulas for Cajun Brown and Cajun Blue.

33.

The formulas for Cajun Brown and Cajun Blue are "trade secrets" under Louisiana law. They are both formulas that derive independent economic value from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain their secrecy. La. R.S. 51:1431;(4).

34.

Defendant Paul Rider acquired Cajun Kleen's trade secrets through misappropriation. Paul Rider has no right, title, or interest of any sort to the formulas for

Cajun Brown or Cajun Blue, or any other formula sold by Anchor Chemical to Cajun Kleen. Furthermore, defendant Paul Rider has used the trade secrets of Cajun Kleen without express or implied consent of Cajun Kleen.  La. R.S. 51:1431(2).

35.

Defendants PCP and Rodney Potts, Jr. have likewise misappropriated Cajun Kleen's trade secrets.  Defendants PCP and Rodney Potts, Jr. know or have reason to know that the trade secrets were acquired by Paul Rider through improper means. Furthermore, defendants PCP and Rodney Potts, Jr. have used the trade secrets of Cajun Kleen without express or implied consent of Cajun Kleen, in spite of the fact of that they knew or had reason to know they had acquired them through Paul Rider, who was a person who had utilized improper means to acquire them.  La. R.S. 51:1431(2).

36.

Upon information and belief, the chemical composition of defendants' products, Geaux Brown and Geaux Blue, are identical to the chemical composition of Cajun Kleen's products, Cajun Brown and Cajun Blue.  Even if the products are found not to be identical, they are substantially chemically similar, to the point of being practically indistinguishable. A visual comparison of Cajun Brown to Geaux Brown reveals that the products are visually identical.  (See Exhibit B, attached hereto).  Furthermore, the defendants products have the same aroma and viscosity as Cajun Kleen's products.

37.

As a result of the misappropriation of Cajun Kleen's trade secrets, defendants have enriched themselves to the detriment of Cajun Kleen.  Defendants have solicited and stolen several of Cajun Kleen's customers, by selling Cajun Kleen's own product to them,

branded with defendants' products name, Geaux Brown and Geaux Blue.

38.

As a result of the misappropriation of Cajun Kleen's trade secrets, defendants have further damaged Cajun Kleen by misleading consumers into believing that Geaux Brown and Geaux Blue are a product of Cajun Kleen.

39.

As a result of the misappropriation of Cajun Kleen's trade secrets, defendants have further damaged Cajun Kleen to the extent that they have disclosed Cajun Kleen's trade secrets to third parties, thereby significantly decreasing the value of Cajun Kleen's trade secrets.

## CAUSES OF ACTION

### *COUNT I – 15 U.S.C. § 1125 CLAIM AGAINST DEFENDANTS FOR FALSE DESIGNATION OF ORIGIN AND DILUTION*

40.

The conduct of defendants is in direct and blatant violation 15 U.S.C. § 1125, which provides a civil remedy for false designations of origin, false descriptions, and dilution.

41.

Defendants have used in connection with goods in commerce the name "Geaux Brown" and "Geaux Blue" which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of defendants with Cajun Kleen, or as to imply the sponsorship or approval of Cajun Kleen.

42.

Defendants actions have caused dilution by blurring, as defined by 15 U.S.C. § 1125(c)(2).

43.

Because defendants have caused dilution by blurring and/or dilution by tarnishment, Cajun Kleen is entitled to injunctive relief, enjoining defendants and their agents from the use of the names "Geaux Brown" and "Geaux Blue" or any other similar mark or name. 15 U.S.C. § 1125(c)(1).

44.

As a result of defendants' willful violations of 15 U.S.C. § 1125, Cajun Kleen is entitled to injunctive relief pursuant to 15 U.S.C. § 1125, 15 U.S.C. § 1116, 15 U.S.C. § 1117, and 15 U.S.C. § 1118.

45.

As a result of defendants' willful violations of 15 U.S.C. § 1125, Cajun Kleen is entitled to recover damages, including but not limited to (1) defendants' profits, (2) damages sustained by Cajun Kleen, (3) the costs of this action, and (4) reasonable attorneys' fees. 15 U.S.C. § 1125(c)(5); 15 U.S.C. § 1117(a).

***COUNT II – CLAIM AGAINST DEFENDANTS FOR VIOLATION OF LOUISIANA UNIFORM TRADE SECRETS ACT (LA. R.S. 51:1431 ET SEQ)***

46.

The conduct of defendants is in direct and blatant violation of the Louisiana Uniform Trade Secrets Act, La. R.S. 51:1431 *et seq*.

47.

Because defendants have misappropriated Cajun Kleen's trade secrets, Cajun Kleen is entitled to injunctive relief pursuant to 15 U.S.C. § 1125 and La. R.S. 51:1432, in the form of preliminary and, ultimately permanent, injunctions enjoining defendants from (1) using any trade secret of Cajun Kleen in any form or fashion, (2) disclosing any trade secret of Cajun Kleen to any person for any reason under any circumstance, (3) possessing any document, file, data compilation, writing, or anything else that contains any trade secret of Cajun Kleen, (4) manufacturing or making any product using any trade secret of Cajun Kleen, including substantially similar products to products which are made using Cajun Kleen's trade secrets, (5) selling any product that is made using any trade secret of Cajun Kleen (with the exception of selling at retail any Cajun Kleen product purchased from Cajun Kleen or one of its authorized distributors), (6) stating or implying to anyone that they have knowledge of any trade secret of Cajun Kleen, (7) profiting, or attempting to profit, from any trade secret of Cajun Kleen in any manner whatsoever, and (8) disclosing to any person that they even have or have ever had knowledge of Cajun Kleen's trade secrets.

48.

Although Cajun Kleen is entitled to the above-reference injunctive relief even without a showing of irreparable harm, pursuant to 15 U.S.C. § 1125 and La. R.S. 51:1432, Cajun Kleen nevertheless will be irreparably harmed if the requested injunctive relief is not granted.  Disclosure and use of Cajun Kleen's trademarks and trade secrets will cause irreparable damage to Cajun Kleen's business.  This is particularly true because the primary value of Cajun Kleen's products is that they are derived from secret formulae and

cannot be replicated by Cajun Kleen's current and potential competitors.

49.

In addition to preliminary and permanent injunctions, Cajun Kleen seeks and is entitled to a *limited* temporary restraining order, without notice to defendants, enjoining defendants from (1) disclosing any trade secret of Cajun Kleen to any person for any reason under any circumstance, (2) stating or implying to anyone that they have knowledge of any trade secret of Cajun Kleen, and (3) disclosing to any person that they even have or have ever had knowledge of Cajun Kleen's trade secrets, until the trial of the preliminary and permanent injunctions can be had.  As noted above, Cajun Kleen respectfully prays that this relief ultimately be incorporated into the preliminary and permanent injunctions.

50.

In the event that such a limited temporary restraining order is not issued, Cajun Kleen will suffer immediate and irreparable injury, loss, or damage before defendants can be heard.  In the event that defendants disclose Cajun Kleen's trade secrets to any third party or the public prior to the hearing on the preliminary injunction, the damage to Cajun Kleen will be incalculable and immense. If defendants disclose Cajun Kleen's trade secrets to any third party or the public, those trade secrets will be forever lost to Cajun Kleen and Cajun Kleen's competitive edge in the market, which is primarily derived from the fact that its products cannot be replicated by its actual or potential competitors, will be forever lost. In addition, defendants will suffer no prejudice as a result of the requested limited temporary restraining order, as they would have no valid reason to disclose Cajun Kleen's trade secrets to any third person or the public anyway.

51.

Undersigned counsel certifies herein that no effort was made to give notice to defendants to the seeking of this temporary restraining order because (1) to undersigned counsel's knowledge, defendants are unrepresented by counsel in this matter, (2) given the bad faith conduct of defendants in misappropriating and attempting to profit from Cajun Kleen's trade secrets, the very real risk exists that if defendants were given notice of this proceeding prior to the issuance of the temporary restraining order, defendants may divulge Cajun Kleen's trade secret to unknown third persons or the public, and (i) that act would not be subject to this Court's contempt power if it occurred prior to the issuance of the temporary restraining order, (ii) in such an event, the damage to Cajun Kleen would be potentially devastating and irreparable, and (iii) the potential prejudice to defendants if the limited temporary restraining order sought by Cajun Kleen is granted is nonexistent, or, at worst, extraordinarily minimal. In other words, giving notice to defendants prior to the issuance of the sought temporary restraining could practically result in Cajun Kleen losing its trade secrets before this case even begins, with no contempt remedy available to Cajun Kleen in such an event.

52.

Due to the fact that defendants cannot suffer any damage as a result of and cannot be prejudiced by the issuance of the sought limited temporary restraining order, Cajun Kleen respectfully requests that the security to be ordered by this Court pursuant to Federal Rule of Civil Procedure 65(c) be in the form of a personal recognizance bond, or in the alternative, be an amount less than $500.00.

53.

In addition to the above-referenced injunctive relief, Cajun Kleen is entitled to damages caused by defendants' misappropriation of its trade secrets. These damages include Cajun Kleen's actual loss, as well as the unjust enrichment of defendants resulting from their misappropriation of Cajun Kleen's trade secrets. La. R.S. 51:1433.

54.

Because defendants' misappropriation was in bad faith, Cajun Kleen is also entitled to an award of reasonable attorneys' fees, pursuant to La. R.S. 51:1434.

*COUNT III – CLAIM AGAINST DEFENDANTS UNDER THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1401 ET SEQ.)*

55.

The conduct of defendants is in direct and blatant violation of the Louisiana Unfair Trade Practices and Consumer Protection Law. La. R.S. 51:1401, *et seq*. ("LUTPA").

56.

LUTPA declares as unlawful "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce . . . ." La. R.S. 51:1405(A).

57.

Defendants are competitors of Cajun Kleen.

58.

Defendants' conduct in (1) misappropriating Cajun Kleen's trade secrets, (2) attempting to profit from the use of Cajun Kleen's trade secrets, and (3) using a substantial similar product in an attempt to confuse consumers regarding the origin of the product are

all unfair methods of competition.

59.

As a result of defendants' violation of LUTPA, Cajun Kleen is entitled to an award of damages and reasonable attorneys' fees.

60.

To the extent that this Court determines that the Louisiana Uniform Trade Secrets Act or the Louisiana Unfair Trade Practices and Consumer Law is inapplicable to Cajun Kleen's proof under Louisiana state law, Cajun Kleen respectfully prays for appropriate damages pursuant to Louisiana Civil Code Article 2315.

## **PRAYER**

WHEREFORE, plaintiff Cajun Kleen Products, LLC respectfully prays that after due proceedings are had that

(1) A temporary restraining order immediately issue, without notice to defendants, enjoining defendants from (A) disclosing any trade secret of Cajun Kleen, including but not limited to any formula, recipe, or list of ingredients for any product manufactured, sold, or owned by Cajun Kleen to any person for any reason under any circumstance, (B) stating or implying to anyone that they have knowledge of any trade secret of Cajun Kleen, and (C) disclosing to any person that they even have or have ever had knowledge of Cajun Kleen's trade secrets, until this order is expressly rescinded by this Court;

(2) A hearing be set at the earliest possible time to determine if a preliminary injunction should issue, and pursuant to Federal Rule of Civil Procedure

    65(a)(2), in this Court's discretion, a ruling that the hearing on the preliminary injunction advance the trial on the merits and consolidate it with the hearing;

(3) Following the hearing, that injunctions, in the form of preliminary injunctions and, ultimately, permanent injunctions, issue enjoining defendants from (1) using any trade secret of Cajun Kleen in any form or fashion, (2) disclosing any trade secret of Cajun Kleen to any person for any reason under any circumstance, (3) possessing any document, file, data compilation, writing, or anything else that contains any trade secret of Cajun Kleen, (4) manufacturing or making any product using any trade secret of Cajun Kleen, including substantially similar products to products which are made using Cajun Kleen's trade secrets, (5) selling any product that is made using any trade secret of Cajun Kleen (with the exception of selling at retail any Cajun Kleen product purchased from Cajun Kleen or one of its authorized distributors), (6) stating or implying to anyone that they have knowledge of any trade secret of Cajun Kleen, (7) profiting, or attempting to profit, from any trade secret of Cajun Kleen in any manner whatsoever, and (8) disclosing to any person that they even have or have ever had knowledge of Cajun Kleen's trade secrets;

(4) A finding that defendants' conduct was a violation of 15 U.S.C. § 1125(a) or a willful violation of 15 U.S.C. § 1125(c) and issuing an order commanding that "all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of the defendant, bearing the . . . word, term, name, symbol, device, combination thereof, designation, description,

or representation that is the subject of the violation, or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same, shall be delivered up and destroyed.

(5) After due proceedings are had, that Cajun Kleen be awarded appropriate damages, costs, expert witness fees, attorneys' fees, and costs associated with this action.

**AYRES, SHELTON, WILLIAMS, BENSON & PAINE, LLC**

By: /s/J. Todd Benson
    J. Todd Benson, #23648 (T.A.)
333 Texas Street, Suite 1400
P.O. Box 1764 (71166-1764)
Shreveport, LA 71101
Phone: (318) 227-3500
Facsimile: (318) 227-3320
Email: toddbenson@arklatexlaw.com

ATTORNEYS FOR CAJUN KLEEN PRODUCTS, LLC